# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SHARON COSEY, ) | |
| ) | |
| Plaintiff, ) | No. 10-CV-2520 |
| ) | |
| v. ) | |
| ) | Magistrate Judge Michael T. Mason |
| EASTER SEALS SOCIETY ) | |
| METROPOLITAN CHICAGO, INC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

On April 23, 2010, plaintiff Sharon Cosey ("plaintiff") filed a two-count complaint [1] against her former employer, Easter Seals Society Metropolitan Chicago, Inc. ("Easter Seals"), alleging racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964. Easter Seals now moves for summary judgment [21] on both counts of plaintiff's complaint. For the reasons set forth below, Easter Seals' motion for summary judgment is granted.[1]

**I.    Relevant Facts**

**A.    Background**

Easter Seals is an Illinois not-for-profit organization that provides comprehensive services for individuals with disabilities or other special needs and their families in order to improve quality of life and maximize the independence of these individuals. (Def.'s

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b). On July 23, 2010, the parties consented to the jurisdiction of the undersigned Magistrate Judge for all future proceedings pursuant to 28 U.S.C. § 636(c) [9].

LR 56.1 Statement of Facts ("SOF") [22] ¶ 4.)  Easter Seals operates the Autism Day School (the "School"), located in Tinley Park, Illinois.  (SOF ¶ 5.)  The School services autistic children from preschool through age 22.  (SOF ¶ 6.)  Maryellen Bucci ("Ms. Bucci") is the School's Program Manager.  (SOF ¶ 7.)  Similar to a school principal, she is responsible for the day-to-day operations of the School.  (*Id.*)

Every student at the School is assigned to a classroom, and each classroom has a classroom teacher.  (SOF ¶ 9.)  Because of their disabilities, many of the students at the School require one-on-one assistance from an aid.  (SOF ¶ 6.)  These "1:1 aides" are assigned to one student and are generally with the student at all times while the student is at the School.  (SOF ¶¶ 6, 12.)  Their job is to assist the student in learning, protect the student, protect others from the student, and to provide assistance to the classroom teacher.  (SOF ¶ 6.)  Typically, each classroom has several 1:1 aides, in addition to the classroom teacher.  (SOF ¶ 11.)

Plaintiff was employed as a 1:1 aide at the School from June 11, 2007 until she was terminated on October 28, 2008.  (SOF ¶¶ 8, 13.)  The June 11, 2007 letter setting out the terms of her employment stated that the employment relationship was "terminable at will, which means that either [plaintiff] or ESMC [Easter Seals] may terminate [plaintiff's] employment at any time and for any reason or for no reason with or without notice."  (SOF ¶ 15; Ex. E to Bucci Aff. [22-1].)  At the time she accepted the position, plaintiff signed three documents regarding her employment: 1) her job description, 2) the staff manual for the 2007-2008 school year, and 3) the School's Policy on Supervision and Accountability for Clients (the "Supervision Policy") (SOF ¶

2

16.) The primary directive of the Supervision Policy is that "[e]ach staff member with direct responsibility for participants is responsible, at all times, for knowing the location and/or activity of all participants within his/her assigned group and ensuring the safety and well-being [of] each of those participants at all times." (Ex. C to Bucci Aff.) It also states that "[i]f a participant is unaccounted for at any time, staff members with direct or indirect responsibility should...notify the Program Manager/supervisor immediately and issue a 'Code Red/Missing Client.'" (*Id.*) The Supervision Policy provides: "[F]ailure to comply with any of the policies contained herein may result in discipline up to and including termination. Gross misconduct is grounds for immediate dismissal." (*Id.*) Plaintiff acknowledged in writing that she reviewed and understood the Supervision Policy and agreed to adhere to its provisions. (SOF ¶ 17.)

      **B.    The September 18, 2008 Incident**

On September 18, 2008, plaintiff was assigned as a 1:1 aide to Tyler, a fifteen-year old student at the School, who functions at the level of an 18-month old. (SOF ¶¶ 23-24.) Tyler is non-verbal and communicates by pointing at a picture book. (*Id.*) That afternoon, plaintiff took Tyler from the classroom to the occupational therapy room. (SOF ¶ 25.) When it was time to return to the classroom, Tyler left the occupational therapy room and turned to walk toward the front door of the school, rather than in the direction of the classroom. (SOF ¶ 26.) Plaintiff saw Tyler heading in the wrong direction, but turned back to pick up his picture book. (SOF ¶ 27.) Plaintiff then lost sight of Tyler and did not tell anyone or ask anyone for help. (SOF ¶ 28, Cosey Dep. Tr. [22-3] at 109.) Two other School employees, Carrie Slaymaker and Ann Nixon-Hammoudeh, saw Tyler leaving the building and saw that plaintiff was not with him or in

the hallway behind him. (SOF ¶ 29; Bucci Aff. at ¶ 20; Ex. 3 to Pl's Br. [22-3], Slaymaker Aff at ¶¶ 5-8; Ex. 4 to Pl's Br. [22-3], Nixon-Hammoudeh Aff. at ¶¶ 5-8.) Once outside, Ms. Nixon-Hammoudeh saw Tyler walking away from the building. (SOF ¶ 30; Nixon-Hammoudeh Aff. at ¶¶ 5-8.) She called his name but he did not respond. (Nixon-Hammoudeh Aff. at ¶ 10.) When Tyler kept walking away from the building, she followed and intercepted him. (Nixon-Hammoudeh Aff. at ¶ 11.) After Ms. Nixon-Hammoudeh stopped Tyler, plaintiff exited the building, walked up to them and stated, "he runs so fast." (SOF ¶ 31; Nixon-Hammoudeh Aff. at ¶¶ 11-13.) According to Ms. Nixon-Hammoudeh, Tyler was not running when he left the building, and plaintiff later testified in her deposition that Tyler does not run. (SOF ¶¶ 32-33; Nixon-Hammoudeh Aff. at ¶ 14; Cosey Dep. Tr. at 108.)

After this incident, Ms. Bucci suspended plaintiff for three days for violating the Supervision Policy and placing a special needs student at risk. (SOF ¶ 34.) The dates of plaintiff's suspension were September 29, September 30 and October 1, 2008. Plaintiff was instructed to report back to work on October 2, 2008. (*Id.*) At her deposition, plaintiff admitted to her actions on September 18, 2008, and she agreed that her conduct was wrong. (SOF ¶ 35.) Her only objection to her suspension was that Ms. Bucci did not discuss the incident with her, but instead relied on the accounts of other employees. (SOF ¶ 36.)

Following her suspension, on October 2, 2008, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") against Easter Seals, claiming that her suspension was an act of racial discrimination. (SOF ¶ 37.) As part of her complaint, plaintiff claimed that a white female teacher, Ms. Stephanie Abel, was not

4

suspended after she had neglected a child under her care. (SOF ¶ 37; Compl. [1] Ex. A.) Ms. Abel was a classroom teacher and, on one occasion while her classroom 1:1 aides were at lunch, one of the students in her classroom left the School building. (Cosey Dep. Tr. at 126.) At her deposition, plaintiff stated that she was not aware of any disciplinary action against Ms. Abel, but she stated that it was possible that Ms. Abel was punished without her knowledge. (SOF ¶ 39; Cosey Dep. Tr. at 128.) She also testified that aside from her claim about Ms. Abel, she had no other proof to support her claim that her suspension was based on racial discrimination. (SOF ¶ 38; Cosey Dep. Tr. at 129.) In fact, Ms. Abel did receive a one-day suspension and a 30-day probationary period for her violation. (SOF ¶ 40.) According to Easter Seals, Ms. Abel was suspended for one day, rather than three, because (unlike plaintiff) she immediately reported the missing child to the administration. (*Id.*)

### C. The October 22, 2008 Incident

A second incident occurred on October 22, 2008, shortly after plaintiff returned from her suspension. On that date, plaintiff was assigned as a 1:1 aide to a student in Ms. Susan Honn's classroom. (SOF ¶ 41.) There were seven students in this classroom, including Victor, who was 18-years old, non-verbal and functioned at the level of a 2-year old. (SOF ¶ 42.) Plaintiff was not Victor's 1:1 aide on this date. (Resp. to Pl's SOF ¶ 52.) At lunch time, plaintiff and two other aides (Tanya O'Connor and Ryan Rohloff) were instructed to bring Ms. Honn's entire class to the lunchroom and to supervise all seven students while they were there. (SOF ¶ 43.) Victor's 1:1 aide was not among the aides assigned to supervise the class in the lunchroom. (Rohloff Dep. Tr. [27-2] at 14, 15.) At some point during lunch, one of the aides gave Victor

5

permission to go to the bathroom on his own. (SOF ¶ 44.) Plaintiff was not aware that Victor left the lunchroom unescorted. (Pl's Resp. to SOF ¶ 83.) A few minutes later, other School employees found Victor standing alone outside the bathroom. (SOF ¶ 46.) Because no one was watching him, they took Victor back to Ms. Honn's classroom. (*Id.*) Ms. Honn told them to return Victor to the lunchroom so that he could assist with the lunchroom clean up. (SOF ¶ 47.) At this point, plaintiff was still not aware that any of the students left the lunchroom or that Victor was no longer with the rest of the class. (SOF ¶ 48; Cosey Dep. Tr. at 143.)

Ms. Rohloff testified that it was a "routine occurrence" that Victor went to the bathroom unescorted. (Pl's Resp. to SOF ¶ 51; Rohloff Dep. Tr. at 19.) However, it was Ms. Honn's practice to allow students capable of walking without assistance to go to the bathroom unescorted, only if the aide maintained visual contact with the student while the student walked to and from the bathroom. (SOF ¶ 49; Ex. 5 to Pl's Br., Honn Aff. [22-3] at ¶ 13-14.) The aide was to watch the bathroom entrance to see when the student emerged and make certain that the student safely found his or her way back to the lunchroom. (*Id.*) In addition, Ms. Honn required that the aides assigned to her classroom "keep count[] of the students assigned to them and know the whereabouts of 'their' students." (SOF ¶ 50; Honn Aff. at ¶ 15.) Plaintiff does not dispute that it was her responsibility to keep count of the students that she and the other aides were responsible for in the lunchroom. (SOF at ¶ 53; Cosey Dep Tr. at 169.) She also does not dispute that on this particular date, they failed to so. (*Id.*)

Ms. Honn reported this incident to Ms. Bucci, who determined that the three aides (plaintiff, Ms. O'Connor and Ms. Rohloff) should be subject to disciplinary action

6

based on their failure to supervise Victor.  (SOF ¶ 56.)  Because this was Ms. O'Connor and Ms. Rohloff's first violation of the Supervision Policy, they were each given a three-day suspension.  (SOF ¶ 57.)  Plaintiff was terminated.  (SOF at ¶ 58.)

**D. Easter Seals' Disciplinary Policies**

According to Easter Seals, plaintiff was terminated because this was her second violation of the Supervision Policy, and it was school policy to terminate an employee for a second strike.  (SOF at ¶ 58.)  Ms. Bucci testified that typically a second strike will lead to termination, but it depends on the particular situation and the level of the infraction.  (Bucci Dep. Tr. [27-1] at 73-74.)  A four-level disciplinary policy now governs when an employee violates the Supervision Policy.  (SOF at ¶ 60; Bucci Dep. Tr. at 73-76; Bucci Aff. at ¶ 41.)  At Level 1, when a supervisor loses track of a student but the student is never unsupervised, a written warning is issued.  (*Id.*)  At Level 2, when a student is unsupervised and the supervisor is aware that the student is missing, reports this to others and is looking for the student, a one-day suspension is imposed.  (*Id.*)  At Level 3, when a student is unsupervised and the supervisor either is not aware that the student is missing or is aware and does not report it to the administration, a three-day suspension is imposed.  (*Id.*)  Finally, at Level 4, when a student is unsupervised and harms him or herself or others, or if the incident is a second violation of the Supervision Policy, the employee is terminated.  (*Id.*)

This four-level policy is not in writing and Ms. Bucci is uncertain whether it was formally in place at the time of plaintiff's termination.  (Pl's Resp. to SOF at ¶ 60; Bucci Dep. Tr. at 77-78.)  However, according to Ms. Bucci, in the past, 21 employees (including plaintiff) have been disciplined for violations of the Supervision Policy.  (Bucci

7

Aff. ¶ 41.) All were disciplined consistent with these guidelines, with the exception of one 1:1 aide, who herself is disabled.[2] (*Id.*) Prior to terminating plaintiff, Ms. Bucci and other school administrators looked back to see what they had done previously in similar situations. (Bucci Dep. Tr. at 70-72, 79-80.) Aside from plaintiff, only one other employee has violated the Supervision Policy on two occasions. (SOF ¶ 64.) Brian Hanson, a white male teacher, received a three-day suspension for his first violation of the Supervision Policy, and was later terminated after a second violation. (*Id.*; Bucci Dep. Tr. at 81, 86-87.) As plaintiff points out, Easter Seals' records indicate that just prior to Mr. Hanson's second violation, there was a separate incident where a student in Mr. Hanson's classroom was missing. (Pl's Resp. to SOF ¶ 64.) This would suggest that Mr. Hanson may have been terminated after a third violation. However, it was unclear whether Mr. Hanson was to blame for this incident or whether that student's 1:1 aide had sole responsibility at the time the student wandered off. (Bucci Dep. Tr. at 87-88.) Ms. Bucci could not recall the specifics of this separate incident. (Bucci Dep. Tr. at 87-90.) At the time of plaintiff's termination, it was her recollection that the infraction which led to Mr. Hanson's termination was only his second violation, and she believed the School's treatment of plaintiff was consistent with this approach. (*Id.*)

---

[2] Terese McFarland is a 1:1 aide, and in order to accommodate her disability, Easter Seals has modified the terms of her employment by providing that she is only responsible for the supervision of one student at a time. (SOF ¶ 63.) An incident occurred when Ms. McFarland, along with other employees, was responsible for a group of students, and one of the students (not Ms. McFarland's assigned student) wandered away from the group. (*Id.*) Although this would have been her second violation of the Supervision Policy, it was determined that she would only receive a one-day suspension because she did not lose track of her assigned student and therefore did not violate the modified terms of her employment. (*Id.*)

### E. Plaintiff's Job Performance and Prior Disciplinary Record

Plaintiff was reviewed in January of 2008 and received an A+ in the areas of Preparation, Presentation and Teamwork. (Resp. to SOF at ¶ 96.) She also received an A in the areas of Behavior Management, Organization, Learning Environment, Assessment of Student Performance and Reinforcement, and she received a 3% raise, which is typically given to employees whose performance is average or above average. (Resp. to SOF at ¶ 96-97.)

Despite these positive reviews, Ms. Bucci's records reflect a number of other issues with plaintiff's employment. During plaintiff's fifteen months at the School, she was assigned to six teachers. (SOF ¶ 18.) Three teachers (Ms. Abel, Ms. Roberts, and Ms. Nichols) complained about her negative attitude in the classroom and asked that plaintiff be reassigned to a different classroom. (SOF ¶ 19.) In January of 2008, Ms. Roberts reprimanded plaintiff for twice using improper restraints on a student. (SOF ¶ 20.) In May of 2008, plaintiff had a verbal confrontation with Ms. Roberts in front of staff and students in the classroom. (SOF ¶ 21.) Plaintiff admitted her conduct to Ms. Bucci and was then transferred out of Ms. Roberts' classroom. (*Id.*) On July 30, 2007, plaintiff received a verbal warning from a classroom teacher regarding an incident that occurred at a swimming pool. (SOF ¶ 22.) Plaintiff was also cited for using her cell phone during the work day and for using the School's fax machine and photocopier for personal use. (*Id.*) Plaintiff received a verbal warning for tardiness in September of 2007, and she was cited for reading a book during working hours and not paying attention to her assigned student in September of 2008. (*Id.*) She also failed to call in to inform the School that she would be absent on October 2, 2008 when she went to the

EEOC office instead of returning to work after her suspension. (*Id.*)

### F. EEOC Complaints

Plaintiff filed two actions with the EEOC against Easter Seals. On October 2, 2008, she alleged that she was subjected to racial discrimination when she was suspended for three days. (Compl. Ex. A.) On November 3, 2008, she alleged both racial discrimination and retaliation, claiming that her termination was in retaliation for filing the initial charge of discrimination. (*Id.*) On January 25, 2010, plaintiff received Notice of Right to Sue letters on both claims. (Compl. Ex. B.) She filed her complaint in this action on April 23, 2010, alleging both racial discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII").

## II. Analysis

### A. Summary Judgment Standard

Summary judgment is appropriate where the evidence of record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute of material fact when "no reasonable jury could find in favor of the nonmoving party." *Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010) (*quoting Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007)). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). We must construe all facts

and draw all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**B.    Count I - Racial Discrimination**

Among other things, Title VII prohibits discrimination or retaliation against any employee based on race. 42 U.S.C. § 2000e-2(a). Easter Seals first argues that there is no genuine issue of material fact with respect to plaintiff's discrimination claim because plaintiff cannot establish a prima facie case. In order to establish racial discrimination under Title VII, a plaintiff may proceed under either the direct method or the indirect method. Because plaintiff does not specify under which method she is bringing her claim, we address both.

**1.    Direct Method**

First, to survive summary judgment under the direct method, a plaintiff must present direct or circumstantial evidence that creates a "convincing mosaic of discrimination" on the basis of race. *Winsley v. Cook County,* 563 F.3d 598, 604 (7th Cir. 2009). This requires "either direct evidence of discriminatory intent (such as an admission) or enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated his firing." *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011). "Circumstantial evidence may include suspicious timing, ambiguous statements, behavior or comments directed at others in the protected class, and evidence that similarly situated employees outside the protected class received systematically better treatment." *Id.* (*citing Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009)). The circumstantial evidence a plaintiff presents "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal–Mart*

11

*Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); *see Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010) (circumstantial evidence in discrimination cases ordinarily consists of "indicators showing what may be the real motivating force for employment decisions").

Because plaintiff has not offered any direct evidence of discriminatory intent, we look for circumstantial evidence in the record, and we find that there is none. Plaintiff cannot point to any statements or behavior towards African-American employees at the School that would suggest any discriminatory intent. Plaintiff has also failed to point to any evidence that Easter Seals "systematically" favored its non-African American employees. Indeed, Easter Seals has provided evidence that 13 white employees and 6 African-American employees (including plaintiff) have been disciplined for violating the Supervision Policy. (Reply to SOF, Ex. 1.) Plaintiff argues that she was the only employee terminated for the incident involving Victor; however, as we will discuss in more detail below, she was the only employee involved for which this was a second violation. As such, we find that plaintiff has failed to meet her burden under the direct method for racial discrimination.

### 2. Indirect Method

Turning to the indirect method, in order to survive summary judgment, plaintiff must establish a prima facie case of discrimination by presenting evidence that: (1) she is a member of a protected class, (2) her job performance was meeting her employer's legitimate expectations, (3) she was subject to a materially adverse employment action, and (4) the employer treated similarly situated employees outside the protected class more favorably. *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 643 (7th Cir. 2006);

*Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)*; see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If she succeeds in establishing the prima facie case, the burden shifts to the defendant to offer a permissible, non-invidious reason for the alleged discrimination. *Keri*, 458 F.3d at 643. If the defendant meets this burden, the plaintiff may then rebut that evidence by showing that the employer's reasons are a pretext for discrimination or that the decision was tainted by impermissible, race-based motives. *Id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 643-44 (*quoting Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 897 (7th Cir. 2003)). If a plaintiff can demonstrate pretext, summary judgment must be denied. *Id.* at 644.

In her response brief, plaintiff argues that there is a genuine issue of fact with respect to pretext. But before we can get to that issue, we must first examine whether plaintiff has established a prima facie case. Plaintiff easily satisfies the first and third elements: she is an African-American and she was terminated from her position. However, the second and fourth elements - whether her job performance met Easter Seals' legitimate expectations and whether similarly situated employees not in her protected class received more favorable treatment - require a more detailed analysis.

With respect to the second prong, plaintiff has not established that her job performance was meeting the School's legitimate expectations. Most notably, plaintiff admits to all the facts surrounding the incidents with Tyler and Victor. (Pl's Resp. to SOF ¶¶ 23-36, 41-53.) She admits that Tyler was out of her sight when he left the building and that she lied when she said he runs so fast. (Pl's Resp. to SOF ¶¶ 29-33.)

13

She also admits that it was her responsibility (along with Ms. Rohloff and Ms. O'Connor) to keep track of Ms. Honn's seven students in the lunchroom and that they failed to do so. (Pl's Resp. to SOF ¶¶ 41-53.) Clearly, plaintiff's actions violate the Supervision Policy, and in a school for children with severe disabilities, it is not unreasonable for the School to expect its employees' compliance.

In support of her position that she was meeting Easter Seals' expectations, plaintiff points to Ms. Rohloff's testimony that it was not uncommon for some students (including Victor) to go to the bathroom alone. (Pl's Resp. to SOF ¶ 51.) However, this does not conflict with Easter Seals' position that even when a student can go to the bathroom unescorted, Ms. Honn required the responsible aides to keep an eye on the student while traveling to and from the bathroom. (Hann Aff. at ¶ 14; Pl's Resp. to SOF ¶¶ 52-53.) In her testimony, Ms. Rohloff even agreed that she and the other aides violated the Supervision Policy when they did not have "eyes on him" while he was gone. (Rohloff Dep. Tr. at 52-55.) As such, we are not convinced there is an issue of genuine fact for the jury regarding plaintiff's job performance. *See Davis v. Time Warner Cable of Southeastern Wisc., L.P.,* 651 F.3d 664, 673-74 (7th Cir. 2011) (summary judgment granted on discrimination claim where there was no dispute that plaintiff engaged in the conduct that led to his termination and other employees had been terminated for similar transgressions).

In addition, the record reflects, and plaintiff does not dispute, that she was written up for a number of violations, such as using the School's fax machine, telephone, and photocopier for personal use, her tardiness, reading a book during the workday and a few conflicts with classroom teachers. (Resp. to SOF ¶¶ 18-22.) For all of these

14

reasons, we do not believe that plaintiff has satisfied this element of her discrimination claim.

Moving on to the fourth element, we also find that plaintiff cannot establish that Easter Seals gave similarly situated employees more favorable treatment. A similarly situated employee is someone "who is directly comparable to her in all material respects." *Winsley*, 563 F.3d at 605 (*quoting Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). In order to meet her burden, a plaintiff must demonstrate that employees who were not in the protected class but who were treated more favorably "were similarly situated with respect to performance, qualifications and conduct." *Keri,* 458 F.3d at 644 (*quoting Snipes v. Ill. Dep't of Corrs.*, 291 F.3d 460, 463 (7th Cir. 2002)).

We find that plaintiff has failed to meet this burden. In her complaint, plaintiff relied on her mistaken belief that Ms. Abel, a white teacher, was not disciplined after violating the Supervision Policy. In fact, Ms. Abel was suspended for this infraction. At her deposition, plaintiff testified that she had no other reason to believe that her suspension was racially motivated. (Cosey Dep. Tr. at 129.)

Plaintiff now argues that she was the "only employee" who was terminated after the incident with Victor, but this argument is misplaced. Plaintiff was terminated because this was her second violation of the Supervision Policy. Ms. O'Connor and Ms. Rohloff were disciplined as well, but they received a three day suspension because this was their first violation. As such, we do not find that Ms. O'Connor and Ms. Rohloff were "similarly situated." *See, e.g., Harris v. Warrick County Sheriff's Dept.*, 666 F.3d 444, 449 (7th Cir. 2012) (white employees were not similarly situated where their job

15

performance problems did not measure up to plaintiff's). In fact, we find that Ms. O'Connor and Ms. Rohloff's suspensions actually undermine plaintiff's discrimination claim because these two white female aides received the same three-day suspension that plaintiff received for her first violation.

Even assuming plaintiff had established a prima facie case, we do not agree that there is any evidence of pretext here. In order to establish pretext, a plaintiff must show that an employer's reasons for termination were "merely made up to cover up their discriminatory reasons." *Keri*, 458 F.3d at 646. A plaintiff must demonstrate that "(1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent." *Montgomery*, 626 F.3d at 396; *Benuzzi v. Bd. of Educ. of the City of Chicago*, 647 F.3d 652, 663 (7th Cir. 2011) (pretext requires the plaintiff to provide evidence "to support an inference that there was an improper motivation proscribed by law"). "Pretext is more than a mistake on the part of the employer; it is a phony excuse." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004).

Under this framework, in order to meet her burden here, plaintiff must show not only that Easter Seals' stated reasons for the suspension and termination "were dishonest or phony, but also that the true reason was based on prohibited discriminatory animus." *Benuzzi,* 647 F.3d at 663-64 (finding no pretext where nothing in the record "so much as hints at" discrimination as a basis for employer's adverse actions). We find that plaintiff has offered no proof of any pretext here. Easter Seals' position is that plaintiff was terminated because she violated the Supervision Policy twice. There is no evidence to suggest that their stated reason is dishonest or rooted in

16

discriminatory motives.

Plaintiff argues that pretext is obvious here because the four-level disciplinary policy was not in writing, may not have been formally in place at the time she was terminated and is enforced on a case-by-case basis. She asserts that this suggests that she was unfairly disciplined. We disagree. The Seventh Circuit has repeatedly stated that the courts "do not sit as a super-personnel department to determine which employment infractions deserve greater punishment." *Harris,* 666 F.3d at 449 *(citing Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006)); *see Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003) ("Above all, we are mindful that courts do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions"). Here, Easter Seals has put forth a legitimate and non-discriminatory basis for terminating plaintiff, namely, her failure to properly supervise a severely disabled child in violation of the Supervision Policy on two occasions. It is our job only to determine whether their decision was racially motivated. Here, without some "semblance of a link" between her race and her termination, plaintiff's discrimination claim "is destined to fail." *Benuzzi*, 647 F.3d at 664. For these reasons, we find that summary judgement in Easter Seals' favor on plaintiff's discrimination claim is appropriate.

    **C.**    **Count II - Retaliation**

Defendant also argues that summary judgment is warranted on plaintiff's retaliation claim. In order to establish a claim for retaliation, plaintiff may also proceed under either the direct or the indirect method. *Benuzzi*, 647 F.3d at 664. Under the direct method, the plaintiff must show that (1) she engaged in statutorily protected

activity; (2) she suffered an adverse employment action taken by the employer; and (3) there was a causal connection between the two. *Id.; Overly v. KeyBank Nat. Ass'n,* 662 F.3d 856, 866 (7th Cir. 2011) (*quoting Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007)). To prevail under the indirect method, the plaintiff must show that (1) she engaged in statutorily protected activity; (2) she performed his job according to the employer's expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated employee. *Vance v. Ball State Univ.,* 646 F.3d 461, 473 (7th Cir. 2011). Similar to the discrimination analysis, if the plaintiff establishes his prima facie case, the burden shifts to the defendant to establish a non-invidious reason for the action. *Id.* The burden then shifts back to the plaintiff to show that the defendant's reason was pretextual. *Id.* Again, because it is unclear which method plaintiff seeks to invoke here, we address both methods and conclude that plaintiff cannot prevail under either.

Under the direct method, plaintiff's discrimination complaint with the EEOC and her subsequent termination satisfy the first two elements. Plaintiff has not, however, satisfied the third element, which requires a showing of a causal connection between the complaint and the termination. In her response brief, plaintiff says very little about her retaliation claim, although she does point out that her termination came "just weeks" after she made her complaint with the EEOC.[3] It is true that "occasionally...an adverse event comes so close on the heels of a protected act that an inference of causation is sensible." *Davis*, 651 F.3d at 675 (*citing Loudermilk v. Best Pallet Co.*, 636 F.3d 312,

---

[3] Plaintiff made her complaint with the EEOC on October 2, 2008. She was terminated on October 28, 2008.

18

315 (7th Cir. 2011). But, "suspicious timing, standing alone, will rarely be sufficient...to create a triable issue." *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (quotations omitted) (seven week interval between harassment complaint and termination did not create "rare case where suspicious timing, without more, will carry the day"); *Benuzzi,* 647 F.3d at 666 (two month time frame did not create an inference of retaliation). Further, given plaintiff's disciplinary record and the fact that she admitted to the conduct that resulted in her termination, we cannot conclude that this is the "rare case" where timing alone may satisfy the direct method. *See Jackson v. Motorola, Inc.*, No. 09 C 1927, 2011 WL 917723, at *10 (N.D. Ill. Mar. 7, 2011) (holding that suspicious timing and poor performance reviews did not satisfy the causal connection element). In addition, although her termination came just weeks after she filed her claim, it immediately followed her second violation of the Policy. Because Easter Seals claims this intervening event led to plaintiff's termination, plaintiff has not established the requisite causal link to prevail on summary judgment under the direct method. *Davis*, 651 F.3d at 675 (plaintiff could not rely on the proximity between complaint and termination where a significant intervening event occurred, which was the defendant's proffered basis for the termination).

Plaintiff also fails under the indirect method because, as discussed above, she cannot establish a prima facie case of discrimination. Her admission that two students under her supervision wandered off, in violation of the Supervision Policy, demonstrates that she was not meeting her employer's expectations. Plaintiff has also not provided sufficient evidence that she was treated less favorably than any similarly situated employee, and Easter Seals has provided a legitimate non-discriminatory explanation

19

for her termination. For all of these reasons, Easter Seals' motion is granted with respect to Count II.

## III. Conclusion

For the foregoing reasons, Easter Seals' motion for summary judgment [21] is granted. Judgment is entered in defendant's favor and against plaintiff on Count I and II of plaintiff's complaint. It is so ordered.

**ENTERED:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: March 16, 2012**